The next case on the docket is number 518-0338, People v. Stivers. Arguing for the appellant, Robert Stivers, is Amanda Ingram. Arguing for the appellee, People of the State of Illinois, is Julie Wykoff. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings. Okay, Ms. Ingram, are you ready to proceed? Yes, ma'am. You may proceed when you're ready. Good morning, Your Honors, Counsel, and may it please the court. My name is Amanda Ingram, and I represent Robert Stivers. I would like to focus my time today on the first issue, whether Stivers invoked his right to silence and whether his inculpatory statement was voluntarily made. However, if there are questions about any of the other issues, I'm happy to answer those as well. At the heart of this case is the question of whether Robert Stivers invoked his right to silence when he said, Can I be done answering questions now because you're just asking me the same questions over and over and I just told you the truth. Both the court in initially denying the motion to suppress and the state in its responsive brief argued that the invocation was not clear and unambiguous because it was phrased as a question. An invocation formed as a question, however, can still be clear and unambiguous. In Miranda itself, the court stated that a suspect could invoke his rights, quote, in any manner. There was never a requirement that the invocation had to be in the form of a declarative statement. In fact, there are numerous cases where courts have found clear and unambiguous invocations, even where the suspect phrased his invocation as a question. Notably, Stivers did not use hedge words such as might or should. Rather, he asked, Can I be done answering questions now? A clear inquiry into his present right to stop answering questions. The answer was yes, he could be done answering questions now. But instead of clarifying the officer shouted and swore at him and shamed him for being for complaining about being encroached upon. Synchron, I thought the court went ahead and suppressed a good deal of the statement. The court suppressed the very end portion of the statement, which included where Mr. Stivers demonstrated with a doll. But the court did not suppress a good. Forty five minutes to an hour of the initial part of the statement where where Mr. Stivers does make an inculpatory statements regarding his actions. But he also made exculpatory statements, right? He did. Yes, he did. He denied throughout up until the end when he eventually did make the inculpatory statements. OK. I hate to move you off center, but you have such limited time. I have a question about the state of mind evidence. State of mind evidence. OK, sure. These Facebook messages between Mr. Stivers and Kath Kathleen Riley. I don't understand the the value in these that were made before the incident. Is that correct? That's correct. So the state was allowed to bring in several days worth of messages between Mr. Stivers and Miss Riley. And the the reason for doing so was ostensibly for his state of mind. But state of mind is only relevant for, at minimum, the morning of the day where CL presented with the injuries at the hospital. So when we're going back to February 2nd, February 3rd, February 4th, I believe the day he went to the hospital was February 5th. But in those several days leading up to there was never any indication that Mr. Stivers planned anything, that there was anything about his state of mind in the several days leading up to the day that CL presented with the injuries at the hospital. So all of those messages were entirely irrelevant to to prove the state's case. They were on the only point of these messages could possibly be would be to paint him as a philanderer, a bad boyfriend, a bad father and somebody who is pursuing an inappropriate relationship with a teenage teenage girl. So I agree with you completely that those messages were not relevant to the charge defense. Well, even though I have questions about their relevancy, the matter wasn't preserved in the lower court, is that correct? What is the standard of review for those? Your Honor, if you can give me just one moment. These. So my my recollection is that these messages were objected to and that they were properly preserved for review. OK, so the state does have the burden to prove that this error was harmless beyond a reasonable doubt. And and I do not believe that they can do so in this case. These were highly irrelevant messages and, you know, had served absolutely no purpose in terms of figuring out getting getting to the truth to the truth of what happened in this case. All right. What about these other incidents of abuse? What do you have to say about those? In addition. OK, so the other incidents of abuse, domestic violence, I'm sorry, of domestic violence. Yes. So, again, these were these were not similar enough to the charge defense to be to be included against Stivers at his trial. I apologize. I just want to get over. I know I've moved you off your argument, but that's fine. That's fine. So so we have to look at factual similarities. So there there are no there was certainly no instance where there was any other abuse of a young infant. There was one incident involving a child. But again, it was a. A disciplinary incident where the discipline was did not meet the the punishment was not appropriate for the age of the child and for what the child allegedly did. He spilled some noodles and made a mess. But that was a that was a disciplinary situation that went a little too far. But there is certainly no evidence that that child was injured, certainly not severely injured as a result of that discipline. The other incidents had to do with Stivers relationship with Brianna, and they clearly had a very toxic and. Hostile relationship with one another where they fought all the time and they had these these outbursts and these big fights and and everybody knew about it. But again, these were these were fights. These were fights between him and his adult girlfriend. This is this is not similar to someone who's abusing a an infant or a young child. Well, the statute allows certain acts of domestic violence to be admissible. What what does the statute say about these kinds of acts? Well, they have to be they have to be they do not have to be close in time. It's it's certainly a factor of the closeness in time as to where they occurred in relation to the charge defense. There's the timeliness. There's factual similarity. And again, I do not think there is factual similarity between these incidents and this case. There is also. Let's see. There's also is there the risk of a mini trial when you're talking about bringing all these other incidents in again? These are these necessary to to prove the state's offense or I'm sorry, the offense that the state has charged. They're not they're not necessary. And again, they're not similar. They're not they were within six months. The timeliness is not so much of an issue. The issue for from Stiver's perspective is certainly that these incidents were not similar, factually similar enough to be relevant and included in the state's evidence against them. And this is also fully preserved. Right. That one was. So the if you circle back around the basic evidence against your client was his admissions and his proximity to the child. Yes. And again, and that sort of circles back to the first issue about why the the statements should have been suppressed, because as we all know, an inculpatory statement, a confession is extremely persuasive. And we know it was persuasive in this case because the jury asked to review the videotape of the statement, which strongly suggests that that great weight was indeed placed on this statement that was allowed against him. Do you think the fact that the jury did that makes the evidence close in this case? I think we can say, yes, that the evidence was close. We had dispute. We had competing expert witness testimony. There was that there were no no one said anything was wrong with CL until later in the afternoon. And yes, that the statement was made under circumstances where Stivers maintains that it was that it was illegally obtained. It should not have been admitted against him. I see that my time is running out. Your honors, if there are no other questions, may I briefly conclude? No, you'll have time at the end of Miss Wyckoff's statement to give us a few more minutes. OK, I apologize. I took most of your time. Miss Wyckoff, why don't you be in? Thank you, Your Honor. May it please the court and counsel. Your honors, Mr. Stivers in this case did not invoke his right to remain silent when he asked, can I be done answering questions now? Because you're just asking me the same questions over and over. In order to invoke his right to remain silent, Mr. Stivers had to do so unequivocally, which has been mandated by our United States Supreme Court in the case Burgess versus Thompson in 2010. Burgess goes into a lot of detail about why exactly it's setting forth that rule. And it's in order to not put law enforcement in a situation where they have to decipher what rights a defendant is invoking. So here, when Mr. Stivers asked a question, a reasonable officer could take that question and think to himself or herself that I don't want you to ask me the same question over and over again. But I'll answer other questions. And that's exactly what law enforcement and Mr. Stivers did. They asked other questions and he proceeded to answer them. As Justice Cates noted, and defense counsel's opening statements here, the trial court went through these issues. I mean, quite frankly, painstakingly, defendant filed a motion to suppress. The parties then submitted extensive briefing and memorandums of law, both sides, the state and defense counsel. The trial court held a hearing on the motion to suppress where witnesses testified. Initially, the trial court denied the motion to suppress in its entirety. Defense counsel then filed a motion to reconsider. Again, the party submitted more briefing, more memorandums of law. The trial court had another motion to suppress hearing, at which time the trial court granted the motion, in part, suppressing what my position is, the most inculpatory part of the defendant's statement, wherein he actually took a doll and demonstrated exactly what he did to CL. The jury never saw that. The trial court suppressed that latter part of the police-recorded interview in this case. Although the standard of review is not an abuse of discretion for this particular issue, it is clear that the trial court exercised significant deference, or this court should give deference to the trial court in this case, because the court exercised so much discretion, went through these issues over and over, heard the parties out, watched the videos, heard from the witnesses, and had a perspective that we're really unable to garnish here in an appellate proceeding. Moreover... Ms. Wykoff, do you believe the evidence in this case was closely balanced? No, it was not closely balanced at all. So, for hypothetical sake, let's take all three things that the defendant's complaining about on appeal. Let's take out the confession, let's take out the domestic violence evidence, and let's take out everything related to Catlin Riley. What are we left with? The state's position is we are left with a lot of evidence that suggested that the defendant was guilty of the offenses in this case. First, the defendant made incriminating statements to his mother, suggesting that he is the one who injured CL. He told his mother, don't mix stories, stick to what I told you. He later texted her asking, did you tell them what I did? Meaning, presumably law enforcement. He then told her to delete this message. These are statements he made to his mother by text message. Defendant made comments to Brianna Livingston while she was pregnant in front of other people, stating that he wished that both she and CL would die. Robert Meek, a neighbor, testified that he heard CL crying loudly, and then suddenly the crying stopped. Meek later observed defendant's mother and her boyfriend walking, shaking their heads, holding their heads in their hands after they had come to the apartment. Well, the mother wasn't the most pristine of characters, was she? Oh, absolutely not, Your Honor, but the jury knew that. The jury heard all of this evidence. It was presented to them, and they were the ones who ultimately decided who was credible and who was not. And the most significant evidence that was presented in this case was the medical evidence. Medical experts for the state, including experts in pediatrics, forensic pathologists, a forensic anthropologist, the attending physicians in the emergency rooms, all testified that CL died of more or less of child abuse. Dr. Renee Markowski, the pediatrician at Cardinal Glennon Hospital, testified that she believed that CL was physically abused. She wrote a report right then and there at the hospital. Dr. Jane Turner conducted an autopsy, which demonstrated that CL had bruises to his face, including his jaw and forehead, bilateral retinal hemorrhages. You don't get retinal hemorrhages from rickets or a closed head trauma because you have rickets. The jury heard all this evidence. They believed the state's medical experts over defendant's medical experts. These injuries are not consistent with the medical evidence that defendant presented in his defense. So, Your Honor, this evidence, the medical evidence, along with some of the circumstantial evidence I just spoke of, that was enough to find him guilty in this case, even if you take out every other thing that defendant says went wrong in this case. Your Honor, briefly, in terms of the domestic violence evidence, this evidence was admissible by statute. The state actually moved forward. They wanted to bring in nine different pieces of domestic violence evidence. Again, the trial court exercised great discretion and allowed four of the nine pieces of evidence to come in. And defendant argues that these four incidents did not bear any resemblance to what happened here. The state disagrees with that very much so. The first incident was about an incident where the defendant punched the hand of a four-year-old ML after he spilled some noodles. This, quite frankly, this is child abuse. If you make a child put their hand on a table and punch it over and over and over while the child cries, that is child abuse. That is similar to what the state alleges occurred here, that the defendant beat his child and this infant died. It doesn't matter if it's a four-year-old versus an infant. The other three incidences did include, had to do more with Brianna Livingston, the mother of CL. However, children are still at play in these other three issues. The incident where Brianna testified that the defendant breached a locked door. She was pregnant at that time with CL. This shows just a complete disregard for the health and welfare of your family, of the mother of your child while she's pregnant with your child. Next, she testified that the defendant threw a baby bottle at her head when CL was crying. Brianna went to pick him up. Defendant got angry with her and chucked a baby bottle at her head, which resulted in a hole in the wall. She's holding the now deceased infant in her arms when he did that. Finally, Brianna testified that defendant restrained her and prevented her from leaving the apartment. She somehow got out and he chased after her. They clearly had a volatile relationship. When defendant did that, he left CL alone on the couch in an apartment with no adults in it. Your Honor, the state's position is children were involved in all of these incidences. By statute, this is the exact kind of evidence that is admissible in these sorts of cases where instances of domestic violence so often go unreported. It's important for jury to hear what happens behind closed doors. What happens behind closed doors in the home of Robert Stivers is significant domestic abuse, significant abuse of children, which ultimately led to the death of his four-month-old infant. Your Honor, briefly as well, related to the testimony and the text messages between Catlin and Riley, we can't just take people's testimony in a vacuum or take evidence in a vacuum. There has to be some reason why you have to give the jury or whoever is hearing the evidence some background as to what's going on here. The text messages between Catlin and defendant in the days leading up to CL's death, including the days concurrent to his death, they demonstrate a background and a timeline of events. Who is this girl? Why is he talking to her? They demonstrate his state of mind to show he is more interested in spending time with her and partying and drinking with her than he is in caring for his own children. But that's an assumption that you're drawing. You've got messages going on between two people days before, and now you're extrapolating from that because he wants to go out with this girl, he's not caring for a child. I don't see that connection there. Well, Your Honor, part of the text messages too were statements that Catlin made to defendant. She worked with Brianna or knew her somehow, the mother of CL. There's statements that Catlin made into those text messages to defendant about how he doesn't get along with Brianna and Catlin doesn't get along with Brianna. Those set the stage for what's happening behind closed doors at home where defendant... Well, this shows what he was doing that day. Well, that's different when you're asking for the truth of the matter asserted versus state of mind evidence. Right. And I... Go ahead. Oh, sorry. I apologize. And I will agree. When I was going through this too, I did get a little bit confused by the states that are referring to this as state of mind evidence because this isn't hearsay. This evidence was not offered for the truth of the matter asserted. So it is odd that then a hearsay exception was used for non hearsay evidence. However, all that the state needed to prove is that this evidence was relevant, which they presented to the trial court. The trial court found it was relevant. Your Honor, I see I'm out of time. If I may finish my thought. If you finish your sentence for me, yes. Thank you, Your Honor. Your Honor, the evidence in this case was overwhelming. Absent this evidence or absent the evidence complained about, defendant still would have been convicted in this case. Thank you. All right. Thank you, Ms. Wykoff. Ms. Ingram, response? Yes, I have several points to make in rebuttal. One is that if you review the video of the interrogation, you will see that the officers did not respond to Stiver's request to be done talking with an assurance that they would stop asking him the same questions over and over and ask different questions instead. That did not happen. What happened was they started shouting and swearing at him. They did not offer him any kind of, oh, well, we see that you don't like us asking the same questions over. We'll ask you some different questions. That did not happen. Secondly, regarding the statements that Stiver's made to his mother, the state is assuming that tell them what I did as a reference to unlawful behavior or abusive behavior, but it's not entirely clear. And again, as Your Honor noted, Stiver's mother had her own history of abuse, and she also had access to the child. The fact that in a fight months previous to this incident that Stiver's allegedly told Brianna that he wished she and the baby would die in no way indicates that months later he had some sort of intention to kill the baby. This was obviously a statement made in the heat of anger and during one of their many, many fights. Secondly, and to move on, the medical evidence was disputed. The state's experts said one thing. The defense experts said another thing. And even if you agree with what the state's experts' conclusions were as to the nature of the medical injuries, they can only say what those injuries were. They cannot establish who inflicted the injuries. That's a completely separate question. And then going on to the statements that the messages between Mr. Stiver's and Miss Riley, I think the state's description of them shows exactly why they were so troubling here. Because he was more interested in partying and drinking with her than taking care of his own children. That's exactly why they wanted this evidence in there in the first place, because it paints him as such a terrible person. There's no other reason to put this kind of evidence in there. It doesn't show his state of mind on the day that CL presented with his injuries. It doesn't show his state of mind at any of the time of that entire day or night when CL presented to the hospital with his injuries and when he was succumbing to those injuries. His state of mind is not at play four and five days later when he's sending flirtatious text messages to a teenager. There is absolutely no relevance to those messages at all for the state to prove the charges in this case. And if there are no other questions, Your Honors, I would just encourage this court to review the interrogation video because it clearly shows precisely what Mr. Stiver said and what was said to him in response. He clearly invoked his right to silence. His statement was otherwise not voluntary. The evidence in this case was close. And this court should reverse his conviction. And remand for a new trial. Thank you. Justice Welch, any questions? No questions. Justice Moore? No. Okay, ladies, thank you so much for your arguments. This matter will be taken under advisement and an order will be issued.